**In re ROBLIN INDUSTRIES, INC., Debtor.**

**William E. LAWSON, as Trustee in Bankruptcy of Roblin Industries, Inc., Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

Bankruptcy No. 85–11161 C.
Adv. No. 88–1374 M.

United States Bankruptcy Court,
W.D. New York.

June 12, 1991.

Donald P. Sheldon, Buffalo, N.Y., for plaintiff.

Davis, Nesper & McElvein (Gabriel J. Ferber, of counsel), Buffalo, N.Y., for defendant.

BERYL E. McGUIRE, Chief Judge.

On July 1, 1985, the debtor filed a voluntary petition under the provisions of Chapter 11, Title 11 U.S.C. The case was converted to Chapter 7 on August 12, 1987.

The complaint in this adversary proceeding was filed on December 29, 1988. It sought to recover from the defendant, Ford

Motor Company, a payment by debtor to defendant of $53,320.78 which is alleged to have been made on or about April 2nd, 1985, and which is alleged to have been preferential and, thus, recoverable under the provision of section 547, Title 11 U.S.C.

The defendant answered, denying material allegations of the complaint and interposing four affirmative defenses and a counterclaim. The affirmative defenses are: failure to state a cause of action, that payment was in the ordinary course of business, that the transfer did not occur within ninety days of the debtor's filing, and that the transfer, if avoidable, is offset by new value given by defendant subsequently. The counterclaim sought to recover from the trustee $105,391.55, which Ford paid to the trustee following a demand by the trustee for the return of alleged preferential payments by the debtor to Ford in May and June of 1985. It is alleged that the payment was made in error inasmuch as the two payments at issue were made in the ordinary course of business and, thus, were not preferential.

The proceeding was tried in January 1991 and all concluding statements and briefs were submitted by April 23rd.

### I.

This Court has jurisdiction of the parties and the subject matter by virtue of a general order of reference entered in the United States District Court for the Western District of New York pursuant to section 157(a), Title 28 U.S.C. This is a core matter as that term is defined by section 157(b), Title 28 U.S.C.

### II.

Many of the background facts are not in dispute. Ford sold scrap metal to the debtor, and the debtor relied heavily upon that source of scrap for its production of steel. In September of 1984, the debtor was delinquent on its payments to Ford and had accrued an indebtedness to it in excess of $700,000. To ensure this source of scrap metal, Roblin approached Ford and entered into an agreement to restructure and pay this debt. The debt was to be repaid by payments of $50,000 per month plus interest at the rate of 10%. Future deliveries of scrap were to be paid for as they were received. The three payments at issue in this litigation were payments made by the debtor pursuant to this agreement.

■ To be preferential, a transfer or, in this case, a payment must have been made:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) ... while the debtor was insolvent;

(4) ...

  (A) on or within 90 days before the date of the filing of the petition;

....

and

(5) that enables such creditor to receive more than such creditor would receive if—

  (A) the case were a case under chapter 7 of this title ...;

  (B) the transfer had not been made; and

  (C) such creditor received payment of such debt to the extent provided by the provisions of this title....

§ 547(b), 11 U.S.C. On the trial record there is no doubt but that the first and second elements have been established. As to the fifth element, the record is certainly sparse. The record discloses that, at the time of trial, the estate had grossed approximately $7,500,000. Additionally, claim is being made by the estate to an overfunded pension fund which involves some $3,223,000. Finally, there may be some additional preference suits. On the other side of the equation, the debtor's summary of liabilities indicates priority and unsecured claims in excess of $37,000,000. From the magnitude of these debts alone it may be inferred that creditors who have filed claims will receive only a small sum on them. While the Court finds that inference fully warranted here, trustees should take note that in closer cases they may fail in proof on this element with such a sloppy presentation. The fundamental facts are

at their fingertips, and there simply is no excuse for not recounting them.

## INSOLVENCY

■ To counter the presumption of insolvency provided by subsection (f) of section 547, Ford has introduced the "SUMMARY OF DEBTS AND PROPERTY" filed by the debtor and offered testimony by counsel for the debtor as to the effort made to accurately portray the debtor's financial picture. That document shows property valued at $69,757,243.30 and debts of $66,039,334.90. Moreover, it is acknowledged that this summary did not include certain real property which later sold for $775,000. Ford argues that later amendments to add some $627,000 in debt (of which over $540,000 was disputed) did not significantly alter this picture of a solvent, going concern at the point of filing. Moreover, to reinforce its argument of vitality, it points out that debtor's bank lenders provided over twelve million in post-petition financing.

In response, the trustee, who again must possess a mountain of relevant information, chose to share little with the Court. Fortunately for the trustee, that offered does suffice to carry his burden.

Insolvency exists when the sum of a debtor's debts is greater than all of such debtor's property "at fair valuation." § 101(32), Title 11 U.S.C.

A leading treatise referencing the principles to be applied under comparable provisions of the former Bankruptcy Act, opined:

> Perhaps the useful and comprehensive resume of the applicable principles was given by Judge Clark in *Syracuse Engineering Co. v. Haight:*
>
>> Fair valuation of an estate such as this might conceivably be based on forced sale prices, or on fair market prices or on so-called intrinsic values, irrespective of sale. A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market

price is the most equitable standard.... It involves a value that can be made available for payment of debts within a reasonable period of time. And fair market value implies not only a "willing buyer", but a willing "seller".[1]

It appears that, at the time of its filing, the debtor was a failing business in a failing industry. Portions of a registration statement which the debtor filed with the S.E.C. on February 10, 1984, are made an appendix to this opinion. Revealed is a company which had been suffering severe losses since 1979, which then believed its liabilities exceeded its assets by over nine million dollars. The debtor's vice president testified that this situation deteriorated and losses continued thereafter.

While it is true that the asset value figures which counsel used in many instances were based upon appraisals, those appraisers never testified in this trial and, hence, it is impossible to gauge how well founded those values are. On the present record which, as noted, demonstrates a failing business in a failing industry, it would appear more probable that those asset values could not be sustained in the crucible of reality. For example, land and building values in particular would be dramatically impacted if no longer useable for steel operations. In short, the Court chooses to believe that the debtor was correct in viewing itself as insolvent in 1984 and, further, that that situation did not improve but in fact deteriorated further at the point of the debtor's filing.

## 90 DAYS

■ The check in question was delivered outside the preference period but was honored (cleared) within that period.

The Fourth Circuit and the Tenth Circuit have split on when a transfer of a check occurs under section 547(b), Title 11 U.S.C. *In re Virginia Information Systems Corp.,* 932 F.2d 338, 21 BCD 1094 (4th Cir.1991); *In re Alan J. and Mary F. Ant-*

---

1. 1 *Collier on Bankruptcy,* Paragraph 1.19[3], p. 124 (14th Ed.1974), *citing Syracuse Engineering Co. v. Haight,* 110 F.2d 468, 471 (2d Cir.1940).

*weil,* 931 F.2d 689, 21 BCD 1069 (10th Cir.1991). This Court concludes that a transfer occurs for the purposes of section 547(b) when the check is honored, essentially for the reasons outlined by the Tenth Circuit. Additionally, that was the rule under the former Bankruptcy Act (section 60) in at least the Second, First, and Eleventh Circuits [*see* Former Act section 60; *In re Lyon,* 121 F. 723 (2d Cir.1903); *Watchmaker v. Barnes,* 259 F. 783 (1st Cir.1919); *Nicholson v. First Inv. Co.,* 705 F.2d 410 (11th Cir.1983)], and the Court sees no reason for departing from that former rule under the current Act.

## THE ORDINARY COURSE DEFENSE

■ Subsection (c)(2) of section 547 provides that a trustee may not void a transfer:

> (2) to the extent that such transfer was—
>
>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>
>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>>
>> (C) made according to ordinary business terms.

Assuming that the agreement between the debtor and Ford to handle debtor's delinquent debt may meet 2(A) and (B), the Court believes that there is no doubt but that it fails (C). Ford relies upon *In re Magic Circle Energy Corp.,* 64 B.R. 269 (Bankr.W.D.Okl.1986) and *In re Gilbertson,* 90 B.R. 1006 (Bankr.D.N.D.1988) to support the contrary argument.

The notion that a delinquent debt, whether being repaid pursuant to formal agreement or not, could be viewed as being made according to ordinary business terms would stand preference theory on its head. The very genesis of the agreement is a failure to pay according to ordinary business terms. Thus, this transaction does not fall within the ordinary course exception. *See In re Craig Oil Co.,* 785 F.2d 1563, 1567 (11th Cir.1986); *Barash v. Public Finance Corp.,* 658 F.2d 504, 511 7th Cir.1981); *In re Gold Coast Seed Co.,* 24 B.R. 595, 597 (9th Cir.BAP 1982); *In re Gull Air, Inc.,* 82 B.R. 1, 3 (Bankr.Mass.1988).

This and Ford's remaining defenses, not having been sustained, are dismissed.

## FORD'S COUNTERCLAIM

Based on the foregoing, it is clear that the counterclaim for return of the monies representing two of debtor's payments to Ford in May and June of 1985 must fail. They were clearly preferential and not subject to any valid defense.

## CONCLUSION

The trustee is entitled to recover $53,-320.78.

Submit a judgment on three days notice.

So Ordered.

## APPENDIX

### HIGH RISK FACTORS

**Losses**

Primarily as a result of a severe decline in demand for domestic steel and the high interest rates on the Company's substantial indebtedness, the Company has sustained severe losses. Losses from continuing operations were $847,931 in 1979, $6,753,526 in 1980, $4,127,251 in 1981, $7,763,976 in 1982 and $3,763,305 for the first forty weeks of 1983. In addition, in 1982, the Company completed its planned divestiture of its non-steel businesses which resulted in an additional loss of $10,001,029 in 1982, net of a gain on the sales of $2,657,288. As a result of these sales, the Company now operates exclusively as a producer of special quality steel bars.

Having operated at a loss in 1979 and all subsequent years, the Company has not had earnings sufficient to cover fixed charges in those years.

The Company anticipates continued losses for the last twelve weeks of 1983 and will not become profitable in the future unless sales increase substantially.

### Negative Net Worth

As a result of its recent losses the Company had an excess of liabilities over assets at December 31, 1982 and at October 8, 1983 of $5,638,523 and $9,397,828, respectively.

### Working Capital, Cash Availability and Bank Financing

Since 1979, the Company has incurred significant losses from continuing operations. These losses are primarily the result of a deterioration of the domestic steel market serviced by the Company. This in turn forced the Company to increase its short-term bank borrowings in an effort to meet its working capital requirements and to maintain operations. The decline in the demand for steel restricted the Company's ability to meet its obligations under its bank and other loan agreements. In 1982 the Company sold its non-steel related businesses and applied most of the cash proceeds to reduce the Company's bank borrowings. However, notwithstanding these efforts, the Company in the latter half of 1982 and the first half of 1983 was not able to meet the interest and principal payments on its bank debt. As a condition to permitting deferral of interest and principal, the Banks required the Company to execute in October 1982 an agreement giving the Banks immediate control over daily cash receipts from the Company's customers and pledging certain assets of the Company which had not been pledged in 1980. Since October 1982 the only means by which the Company has been able to obtain cash for operations has been by borrowing from the Banks.

On August 1, 1983, the Company and the Banks entered into an amended credit agreement pursuant to which the due date of the outstanding principal balance of the Company's term debt ($12,549,557) and revolving credit debt ($5,523,556) was extended to September 30, 1986, and the Company is permitted to borrow against specified percentages of its accounts receivable and inventories subject to a limit on borrowings of $10,000,000 through June 17, 1984, and $12,000,000 from June 18, 1984 through September 30, 1986. Also, payment of interest and finance charges on the Company's Bank indebtedness from July 1, 1982 to March 31, 1983, which amounted to $2,913,739 as of June 30, 1983, was deferred to September 30, 1986. The Company will be dependent upon the cash obtainable under the credit agreement to maintain operations.

The Company and the Austrian Bank which financed the Company's purchase of a forge rolling machine in 1979 have entered into an agreement extending the due date of the outstanding principal balance of the Company's indebtedness of approximately $1,662,000 to September 30, 1986.

In addition, on August 31, 1983, the Company borrowed $2,000,000 from two of the Banks for general working capital purposes. The Company's indebtedness under this loan is guaranteed by the Al Tech Trust Fund, whose guaranty is secured by certificates of deposit owned by the New York Job Development Authority.

In the event that the Company has annual net income, as defined, it will be required to apply 30% thereof to the prepayment of deferred interest and finance charges and principal on its bank indebtedness.

### Adverse Market Conditions

The United States steel industry operated at Depression-era levels in 1982. The industry fell below 49% of capacity in 1982, comparable to the rate of utilization in the 1930's.

The Company has been severely affected, having operated at an average capacity rate of 54% in 1980, 65% in 1981, 40% in 1982 and 45% in the first forty weeks of 1983. The automotive, hand tool, railroad car spring and farm equipment industries are the largest direct or indirect customers for the Company's products, accounting for approximately 37%, 18%, 6% and 4%, respectively, of the Company's shipments in 1982. In 1982 and the first forty weeks of 1983, General Motors Corporation accounted for approximately 26% and 35%, respectively, of the Company's sales.

The Company is dependent for survival upon a continued recovery in steel demand.

## Liquidity

The Company has been successful in deferring or postponing the payment of many of its current obligations (e.g., the indebtedness to the Banks and the Austrian Bank, the maturity on its 6½% Debentures exchanged for 14% Debentures, payments to its hourly and salaried personnel). The Company has also incurred new borrowings and is negotiating with the ITA for an additional loan of $4,000,000. In addition, the Company faces potential pension and tax liabilities and substantial claims asserted in litigation against the Company.

If the Company's business does not improve substantially prior to September 30, 1986, it will not be able to generate the cash required to satisfy these long-term, deferred and potential liabilities as they may come due without either renegotiating its bank agreements to extend the maturity of its bank debt and possibly increase the amount available under the revolving credit arrangement, or securing new sources of financing. Because of the Company's present financial condition it may not be possible for it to extend the maturity date of its bank debt, increase its line of credit or secure new sources of financing in the future.