KOELTL, District Judge:
 

 This is an appeal by Ford Motor Company (“Ford”) from an order of the United States District Court for the Western District of New York, Richard Arcara,
 
 District Judge,
 
 affirming a final judgment and order of the Bankruptcy Court, Beryl E. McGuire,
 
 Chief Judge. See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),
 
 127 B.R. 722 (Bankr.W.D.N.Y.1991). The underlying bankruptcy case was filed originally by the debtor Roblin Industries, Inc. (“Roblin”) as a Chapter 11 petition on July 1, 1985, and later converted to a Chapter 7 liquidation in August 1987. The Chapter 7 trustee, William E. Lawson (the “Trustee”) brought a complaint in this case against Ford to recover a payment made by Roblin to Ford on the basis that the payment was a preferential transfer recoverable under 11 U.S.C. § 547. Following a two day non-jury trial, judgment was entered for Roblin and the District Court affirmed.
 

 On this appeal, Ford contends that the Bankruptcy Court erred in concluding that the Trustee proved that Roblin was insolvent when it made the preferential payment to Ford. Ford also contends that the transfer should not have been avoided in any event because the payment fell within the statutory exception under 11 U.S.C. § 547(c)(2) for certain specified payments made in the ordinary course of business.
 

 Our review of an order of the district court acting as an appellate court in a bankruptcy proceeding is plenary. We review independently the factual findings of the bankruptcy court for clear error, while questions of law are reviewed de novo.
 
 Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Prods. Co., Inc.),
 
 68 F.3d 26, 29 (2d Cir.1995);
 
 United States Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.),
 
 30 F.3d 385, 387 (2d Cir.1994),
 
 cert. denied,
 
 — U.S. —, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995);
 
 Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.),
 
 896 F.2d 1384, 1388 (2d Cir.1990). We affirm.
 

 I.
 

 Roblin, a manufacturer of specialized steel, relied upon Ford for raw scrap metal. By September 1984, Roblin had accumulated a trade debt to Ford for purchases of scrap metal of about $745,000 and had fallen behind on its payments. Although Ford had made no effort to collect the overdue account, Roblin, out of concern for ensuring a steady source of supply, approached Ford to arrange a repayment plan for the outstanding balance and to negotiate terms for new purchases. After discussion, Ford and Roblin entered into an agreement whereby Roblin would pay off its debt to Ford at $50,000 per month plus interest at an annual rate of ten percent. Ford also agreed to continue selling scrap metal to Roblin with payment due on shipment. Over the following months, Roblin made its monthly payments to Ford pursuant to the agreement.
 

 On July 1, 1985, Roblin filed its voluntary Chapter 11 petition. The payment that is the subject of this action was made by check dated March 29, 1985 and honored on April
 
 *34
 
 2,1985 in the amount of $53,320.78.
 
 [1]
 
 In the action brought before the Bankruptcy Court, the Trustee recovered this payment as a voidable preferential transfer.
 
 [2]
 

 II.
 

 To be recoverable as a preferential transfer, a payment must satisfy all of the requirements of 11 U.S.C. § 547(b); it must have been:
 

 1. to or for the benefit of a creditor;
 

 2. for or on account of an antecedent debt owed by the debtor before such transfer was made;
 

 3. made while the debtor was insolvent;
 

 4. on or within 90 days before the date of filing of the petition (providing that the payee is not an insider); and
 

 5. enable the benefited creditor to receive more than such creditor would have received had the ease been a chapter 7 liquidation and the creditor not received the transfer.
 

 See
 
 11 U.S.C. § 547(b). The Trustee bears the burden of proving each of these elements by a preponderance of the evidence.
 
 See
 
 11 U.S.C. § 547(g);
 
 ABB Vecto Gray, Inc. v. First Nat’l Bank of Bethany, Oklahoma,
 
 9 F.3d 871, 874 (10th Cir.1993) (citing 4 Collier on Bankruptcy ¶ 547.21[5], at 547-107 (15th ed. 1995));
 
 Ralar Distribs., Inc. v. Rubbermaid, Inc. (In re Ralar Distribs., Inc.),
 
 4 F.3d 62, 67 (1st Cir.1993).
 

 Ford contests only the third element — whether the Trustee proved that the debtor was insolvent when the alleged preferential transfer was made. None of the other elements are disputed. For the purposes of the third element, the debtor is presumed insolvent during the ninety days preceding the filing of the petition.
 
 See
 
 11 U.S.C. § 547(f);
 
 Riddervold v. Saratoga Hosp. (In re Riddervold),
 
 647 F.2d 342, 344 (2d Cir.1981). This presumption is a rebut-table one. A creditor may rebut the presumption by introducing some evidence that the debtor was not in fact insolvent at the time of the transfer. If the creditor introduces such evidence, then the trustee must satisfy its burden of proof of insolvency by a preponderance of the evidence.
 
 See Clay v. Traders Bank of Kansas City,
 
 708 F.2d 1347, 1351 (8th Cir.1983) (presumption affords initial benefit but ultimate burden remains on trustee to prove insolvency);
 
 Nugent v. First American Bank,
 
 No. 91-CV-1410, 1992 WL 200635, at *3 (N.D.N.Y. Aug. 12, 1992).
 

 Ford argued to the Bankruptcy Court that it successfully rebutted the presumption by introducing the schedules of assets and liabilities prepared by Roblin in support of its Chapter 11 bankruptcy petition. The “Summary of Debts and Property” in the schedules listed total debts of $66,039,334.90 and total property of $69,757,243.30, resulting in an excess of assets over liabilities of a little more than $3.7 million. Ford also introduced the amendments to the schedules that reflected additional liabilities of $626,730.38, of which $540,000 was disputed. The amendments also added real property omitted from the original schedules at the $775,000 price for which the property was sold six months after the filing. Based on these amendments, Roblin’s assets exceeded liabilities by nearly $3.9 million. The schedules were prepared by Roblin’s counsel and verified by its president.
 

 Ford also pointed to the fact that Marine Midland Bank and Chemical Bank, Roblin’s primary lenders, had committed to provide $12 million in post-petition financing on the basis of the appraisals used to compile the
 
 *35
 
 schedules. Although this financing was withdrawn in December 1986, Ford maintains that the willingness of the banks to lend on the basis of the appraisals bolsters the accuracy of the appraisals and lends further support to the conclusion that Roblin was solvent at the time the payment.to Ford was made in April 1985.
 

 The Bankruptcy Court found that the presumption of insolvency was rebutted. The Trustee, however, offered evidence to establish that, indeed, the debtor was insolvent at the time of the transfer. Primarily, the Trustee relied on a February 1984 SEC Registration Statement amending the company’s S-l Registration Statement with respect to stock warrants. The Registration Statement included financial statements as well as descriptive text recounting Roblin’s operations, financial performance, and industry conditions. The balance sheet, which valued most property at cost less depreciation, showed assets as of October 8, 1983, of $42,130,495 and liabilities of $51,528,323, resulting in a negative net worth of $9,397,828. The Registration Statement indicated continuing losses from operations for each year from 1979 through nearly all of 1983, including losses of $7,763,976 in 1982 and $3,763,305 for the first forty weeks of 1983.
 

 The Registration Statement included assessments of Roblin’s financial health in particular, and the condition of the steel industry generally. The picture painted was grim. The industry was described as operating during 1982 at severely depressed levels, and the survival of the company was described as depending on a substantial rebound in steel demand. The description from the Registration Statement of the adverse market conditions facing Roblin during the mid-1980s appears as an appendix to the Bankruptcy Court’s opinion.
 
 See Roblin,
 
 127 B.R. at 725-27.
 

 Based principally on the information contained in the Registration Statement, combined with misgivings about the reliability of the schedules, the Bankruptcy Court found that Roblin was, in fact, insolvent at the time the payment was made to Ford.
 
 Id.,
 
 127 B.R. at 724. The Bankruptcy Court found that Roblin was a “failing business in a failing industry.”
 
 Id.
 
 The Court indicated that it had considered the asset values from the schedules but determined that those values “could not be sustained in the crucible of reality.”
 
 Id.
 
 The District Court affirmed, concluding that this result was not clearly erroneous.
 
 In re Roblin Indus., Inc.,
 
 91 CV 523A (W.D.N.Y. Mar. 29, 1995)
 
 (Roblin II).
 

 Ford argues that the Bankruptcy Court’s finding that Roblin was insolvent at the time the payment in question was made was clearly erroneous, particularly because the use of the balance sheet values from the Registration Statement was insufficient to sustain the Trustee’s burden to show that the debtor was insolvent.
 

 III.
 

 The Bankruptcy Court has broad discretion when considering evidence to support a finding of insolvency. Insolvency is a question of fact,
 
 Klein v. Tabatchnick,
 
 610 F.2d 1043, 1048 (2d Cir.1979);
 
 Join-In Int’l. (U.S.A.) Ltd. v. New York Wholesale Distribs. Corp. (In re Join-In Int’l (U.S.A.) Ltd.),
 
 56 B.R. 555, 560 (Bankr.S.D.N.Y.1986), and the findings of the Bankruptcy Court in this regard will not be disturbed unless they are clearly erroneous.
 
 See Harvey v. Orix Credit Alliance, Inc., (In re Lamar Haddox Contractor, Inc.),
 
 40 F.3d 118, 120 (5th Cir.1994);
 
 Beldock v. Faberge, Inc. (In re S & W Exporters, Inc.),
 
 No. 88 Civ. 8780, 1990 WL 52300, at *4 (S.D.N.Y. Apr. 18, 1990) (“The question of insolvency is an issue of fact and a Bankruptcy Court’s findings cannot be set aside unless they are clearly erroneous.” (citing 1 Collier on Bankruptcy ¶ 1.19[5], at 130.12 (14th ed. 1974))).
 

 “Insolvent” is defined by the Code as a “financial condition such that the sum of [the] entity’s debts is greater than all of [the] entity’s property, at a fair valuation.... ” 11 U.S.C. § 101(32). Fair value, in the context of a going concern, is determined by the fair market price of the debtor’s assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor’s debts.
 
 See Rubin v. Manufacturers Hanover Trust Co.,
 
 661 F.2d 979, 995 (2d Cir.1981);
 
 Syracuse Engineering Co., Inc. v.
 
 
 *36
 

 Haight,
 
 110 F.2d 468, 471 (2d Cir.1940);
 
 Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.),
 
 144 B.R. 663, 666-67 (Bankr.S.D.N.Y.1992);
 
 see also Briden v. Foley,
 
 776 F.2d 379, 382 (1st Cir.1985) (Timbers, J.) (fair valuation of assets should focus on fair market value “reduced by the value of the assets not readily susceptible to liquidation”); 2 Collier on Bankruptcy ¶ 101.32[5], at 101-116 to 101-118 (15th ed. 1995).
 

 Ford contends that the evidence of Rob-lin’s insolvency was inadequate to sustain the Trustee’s burden because the evidence consisted of asset values from the balance sheet in the Registration Statement, values based on the cost rather than the market value of those assets.
 

 Ford is correct that many of the balance sheet figures in the Registration Statement used historical cost less accumulated depreciation, or “book value” for valuing most assets. It is also true that book values are not ordinarily an accurate reflection of the market value of an asset.
 
 See, e.g., United States Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.),
 
 132 B.R. 247, 258 (Bankr.S.D.N.Y.1991) (cost or book value not presumptively equivalent to fair value),
 
 aff'd.,
 
 162 B.R. 410 (S.D.N.Y.1993),
 
 rev’d. on other grounds,
 
 30 F.3d 385 (2d Cir.1994),
 
 cert. denied,
 
 — U.S. —, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995);
 
 DeRosa v. Buildex Inc. (In re F & S Central Mfg. Corp.),
 
 53 B.R. 842, 849 (Bankr.E.D.N.Y.1985) (“Asset values carried on a balance sheet, even if derived in accordance with generally accepted accounting principles, do not necessarily reflect fair value.”). “[T]he market value of particular property may of course differ substantially from its book value, and the market value of certain ... assets may [be] greater or less than their book value.”
 
 Rubin,
 
 661 F.2d at 995. Nevertheless, while book values alone may be inappropriate as a direct measure of the fair value of property,
 
 see Lamar Haddox,
 
 40 F.3d at 121-22;
 
 Rubin,
 
 661 F.2d at 995;
 
 Varon v. Trimble, Marshall & Goldman, P.C. (In re Euro-Swiss Int’l Corp.),
 
 33 B.R. 872, 885 (Bankr.S.D.N.Y.1983), such figures are, in some circumstances, competent evidence from which inferences about a debtor’s insolvency may be drawn.
 
 See Schlant v. Schueler (In re Buffalo Auto Glass),
 
 187 B.R. 451, 453 (Bankr.W.D.N.Y.1995) (finding debtor insolvent based on negative retained earnings reported on tax return in absence of any other evidence);
 
 Coated Sales,
 
 144 B.R. at 666-67 (using unaudited preliminary balance sheet as evidence of insolvency with respect to preference payment made several months after date of statement).
 

 In any event, Ford is not correct that the only information derived from the SEC Registration Statement was the negative net worth figure of $9.4 million. Certainly this was part of the information on which the Bankruptcy Court relied in concluding that the Trustee had met its burden of proving that Roblin was insolvent at the time of the transfer.
 
 See Roblin,
 
 127 B.R. at 724. But the figure itself is by no means the only relevant information found in the Registration Statement, as is evident from the fact that the Bankruptcy Court appended to its opinion a great deal more. The appendix to the Court’s opinion includes many of the “High Risk Factors” from the Registration Statement. The first section entitled “Losses” discusses the severe losses Roblin sustained since 1979, including $6.8 million in 1980, $4.1 million in 1981, $7.8 million in 1982, and $3.8 million for the first forty weeks of 1983. The narrative reveals that Roblin’s earnings had failed to cover fixed expenses since 1979. According to the Registration Statement, losses were expected to continue through 1983 and future profits would depend on a substantial increase in sales.
 
 See id.,
 
 127 B.R. at 725-27.
 

 In another section discussing working capital and bank financing, the report indicates that Roblin was unable to pay the principal and interest on its bank debt for the latter half of 1982 and the first half of 1983. Yet another section describes market conditions in the steel industry as “Depression-era,” comparing the capacity utilization rate of 49% in 1982 to that of the 1930s. The impact of such dismal demand on Roblin is called “severe.” The report concludes that “[Rob-lin] is dependent for survival upon a contin
 
 *37
 
 ued recovery in steel demand.”
 
 Id.,
 
 127 B.R. at 726.
 

 Through the first half of 1985, when the payment to Ford was made, there was no evidence to suggest a recovery had occurred or that Roblin had recuperated. In fact, Roblin’s vice president of finance, Gerald Roncolato, testified at trial that the market deterioration that caused the losses beginning in 1979 had continued with “increased intensity” thereafter. Roncolato further testified that he believed Roblin continued to lose money after October 1983, the date of the latest figures in the Registration Statement. In fact, Roncolato expressed the view that, had the banks withdrawn their post-petition financing in December 1985 instead of December 1986, he would have understood it.
 

 In this case, it is appropriate to consider the financial statements included in the Registration Statement, as well as the accompanying descriptive text, to shed light on the schedules of property and debt values. Those schedules, prepared by the debtor, purported to show an excess of assets over liabilities of only about $8.9 million. Indications that the assets were overvalued in excess of $3.9 million would be affirmative evidence that the debtor was insolvent. There was in fact considerable evidence that the asset values in the schedules were overstated.
 

 The schedules prepared in mid-1985 were based to a large extent on appraisals performed some time before, in some cases some real property appraisals dated to 1980. For personal property, appraisals from 1980, updated in 1982 to reflect inflation and market changes but not physical changes, were employed. The attorney who assembled the schedules testified that the schedules were prepared by extrapolating from the older appraisals, and the Bankruptcy Court, with the benefit of the live testimony of the witnesses and an intimate understanding of the case as a whole considered it “impossible to gauge how well founded those values [were].”
 
 Roblin,
 
 127 B.R. at 724.
 

 The vintage of the appraisals is not the only reason for a more critical view of the schedules. The largest single asset appearing on the schedules was an entry for the machinery and equipment at the plant in Dunkirk, New York. The testimony at trial indicated that this machinery consisted principally of the GFM rolling machine purchased at a cost of $25 million. Roncolato testified that the machine itself cost $7-8 million while the remaining $17-18 million represented the cost of special modifications to the building in order to house the highly sophisticated equipment. The appraisal of the GFM machine ultimately incorporated in the schedules prepared in mid-1985 indicated the value of this asset in place at $22-23 million. A still later appraisal in 1986 valued the same machine at $18 million. Roncolato also testified that only a sale of the machine in place in the building could be expected to recover the value attributable to the building modifications; the value of the GFM machine alone would be approximately one-third as much.
 

 Given the testimony, there is an ample basis to conclude an appraisal based on sale of the GFM machine in place may well have substantially overstated the fair valuation of the equipment. Moreover, the later 1986 appraisal of $18 million was evidence that the value of the GFM machine in April 1985, even if sold in place, would have been substantially less than the earlier appraisal of $22-23 million.
 
 See Coated Sales,
 
 144 B.R. at 668 (court may consider information subsequent to date of payment to assure “valuation is based in reality”). The difference of $4-5 million is enough by itself to absorb entirely the slim margin of solvency on which Ford rests its argument.
 

 Furthermore, the Bankruptcy Court received in evidence a “Summary of Value Conclusions” compiled by the debtor’s appraisal firm, which appears to have been prepared in 1982. The summary presents both fair market and liquidation values for the real and personal property at each of six Roblin sites. Several of the fair market values for personal property are the same figures used to prepare the schedules. The summary indicates a $22.1 million difference between the fair market value of Roblin’s assets of $63 million and the liquidation value of $40.9 million. The large variance between
 
 *38
 
 the two appraisal values is significant in light of the evidence of Roblin’s continued poor performance and significant losses, the foreign competitive pressures coming to bear, the unusually low demand for steel, and Rob-lin’s precarious creditworthiness. According to the schedules as amended, Roblin was solvent by a mere $3.9 million, only about 5% of its total asset base. The variance in the two appraisals is over five times as much. In light of the other information about the conditions in the industry, Roblin’s unstable financial condition, and its persistent losses through 1983, a year after the appraisal updates, we cannot say it is unreasonable to draw an inference that, in April 1985, Roblin could not have realized the values listed in the appraisals and was in fact insolvent.
 

 This is not to suggest that the approach taken in this case is the ideal method of determining insolvency. Whenever possible, a determination of insolvency should be based on seasonable appraisals or expert testimony.
 
 See, e.g., Klein,
 
 610 F.2d at 1048 (finding of insolvency often depends on expert testimony). Yet, appraisals are neither the exclusive nor dispositive means to make the determination.
 

 [T]he matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the “fair valuation” defined in § 101[(32)] by the most appropriate means.
 

 Porter v. Yukon Nat'l. Bank,
 
 866 F.2d 355, 357 (10th Cir.1989).
 

 In light of the circumstances of this case, and our reading of the record and the Bankruptcy Court’s opinion, we conclude that the finding that Roblin was insolvent at the time of the April 1985 payment is not clearly erroneous. Had the only basis for the Bankruptcy Court’s finding been a negative net worth figure based on book values, we might reach a different conclusion, particularly because the schedules prepared by the debtor, on their face, indicate a thin margin of solvency. Here, however, there is more evidence in the record to support the finding of insolvency than merely the negative net worth figure based on the financial statements appearing in the SEC Registration Statement. The heavy losses sustained by Roblin in the years preceding April 1985, the lethargic demand for steel combined with burgeoning foreign competition, the tenuous state of Roblin’s credit standing, the large portion of asset value attributable to the GFM machine and the dynamics of its valuation, the wide gap between fair market and liquidation value, the age of the appraisals, and all of the other factors discussed above, all combine to provide a reasonable basis to conclude that Roblin was insolvent in April 1985. In light of these considerations, we cannot say that the Bankruptcy Court’s determination that the Trustee had met its burden of proving that Roblin was in fact insolvent at the time of the transfer was clearly erroneous. That determination is therefore affirmed. Consequently, the April 1985 payment to Ford was a preferential transfer voidable by the Trustee pursuant to 11 U.S.C. § 547(b).
 

 IV.
 

 Having concluded that the payment to Ford was indeed a preferential transfer, the remaining issue is Ford’s asserted defense under 11 U.S.C. § 547(c)(2). This defense, commonly referred to as the ordinary course of business exception, provides a safe harbor from the trustee’s avoidance powers for certain preferential payments. The exception under 11 U.S.C. § 547(e)(2) consists of three elements:
 

 (e) The trustee may not avoid under this section a transfer
 

 ifc sfc
 

 (2) to the extent that such transfer was—
 

 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 

 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 

 (C) made according to ordinary business terms.
 

 
 *39
 
 A creditor asserting the defense bears the burden of proving each of the three elements by a preponderance of the evidence. 11 U.S.C. § 547(g);
 
 see Advo-System, Inc. v. Maxway Corp.,
 
 37 F.3d 1044, 1047 (4th Cir.1994);
 
 Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.),
 
 25 F.3d 728, 732 (9th Cir.1994);
 
 Jones v. United Sav. & Loan Ass’n. (In re U.S.A. Inns of Eureka Springs, Ark., Inc.),
 
 9 F.3d 680, 682 (8th Cir.1993).
 

 The Bankruptcy Court found that Ford was not entitled to the exception. Chief Judge McGuire held that:
 

 Assuming that the agreement between the debtor and Ford to handle debtor’s delinquent debt may meet 2(A) and (B), the Court believes that there is no doubt but that it fails (C).
 

 The notion that a delinquent debt, whether being repaid pursuant to formal agreement or not, could be viewed as being made according to ordinary business terms would stand preference theory on its head. The very genesis of the agreement is a failure to pay according to ordinary business terms. Thus, this transaction does not fall within the ordinary course exception.
 

 Roblin,
 
 127 B.R. at 725. The District Court affirmed, explaining that Ford had failed to establish that the payments were made according to ordinary business terms.
 
 Roblin II,
 
 slip op. at 13.
 

 On appeal, Ford argues that the Bankruptcy Court’s finding that the April payment was not protected by the ordinary course of business exception was clearly erroneous. The Trustee responds by arguing that the repayment agreement was a direct result of Roblin’s default on its trade debt to Ford and that a restructured payment plan on a defaulted debt cannot be considered ordinary. In any event, the Trustee argues, Ford introduced no evidence to suggest that the repayment agreement was typical either as between Ford and Roblin or within the industry generally.
 

 Bankruptcy courts in this Circuit have noted the absence of clear direction from this Court with respect to the interpretation of the elements of § 547(c)(2).
 
 See, e.g., McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.),
 
 185 B.R. 103, 114 (Bankr.E.D.N.Y.1995) (Duberstein, C.J.);
 
 Wallach v. Vulcan Steam Forging Co., Inc. (In re D.J. Management Group, Inc.),
 
 164 B.R. 831, 833 (Bankr.W.D.N.Y.1994) (Kaplan, C.J.) (“Few issues in Bankruptcy Law are as unsettled in this Circuit as is the question of how one defines the ‘ordinary course of business’ and ‘ordinary business terms’ for purposes of 11 U.S.C. § 547(c)(2)_”). This case provides us the opportunity to join our colleagues in other circuits by setting forth the appropriate standard for § 547(c)(2)(C).
 

 A.
 

 With a single exception, each Circuit Court of Appeals to grapple with the meaning of “ordinary business terms” has come to the conclusion that the phrase refers broadly to customary terms and conditions used by other parties in the same industry facing the same or similar problems.
 
 See Advo-System,
 
 37 F.3d at 1048;
 
 Grand Chevrolet,
 
 25 F.3d at 733;
 
 Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.),
 
 18 F.3d 217, 223 (3d Cir.1994);
 
 Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners),
 
 12 F.3d 1549, 1553 (10th Cir.1993),
 
 cert. denied,
 
 — U.S. —, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994);
 
 U.S.A. Inns,
 
 9 F.3d at 683-84;
 
 In re Tolona Pizza Prods. Corp.,
 
 3 F.3d 1029, 1032-33 (7th Cir.1993);
 
 Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.),
 
 957 F.2d 239, 243-44 (6th Cir.1992). Only the Court of Appeals for the Eleventh Circuit has held that no evidence of industry practice beyond the conduct of the debtor and creditor in question is necessary to satisfy § 547(c)(2)(C).
 
 See Marathon Oil Co. v. Flatau (In re Craig Oil Co.),
 
 785 F.2d 1563, 1566-67 (11th Cir.1986).
 

 In
 
 In re Tolona Pizza Products Corp.,
 
 3 F.3d 1029 (7th Cir.1993), the Court of Appeals for the Seventh Circuit in an opinion by Judge Posner held that “ordinary business terms” refers to the general practices of similar industry members, and that “only dealings so idiosyncratic as to fall outside that broad range should be deemed extraor
 
 *40
 
 dinary and therefore outside the scope of subsection C.”
 
 Id.,
 
 3 F.3d at 1033. Under this standard, a creditor must show that the business terms of the transaction in question were “within the outer limits of normal industry practices,”
 
 id.,
 
 in order to satisfy the third element of § 547(c)(2). The conduct of the debtor and creditor are considered objectively in light of industry practice.
 

 The objective nature of the approach adopted in
 
 Tolona Pizza
 
 has been widely endorsed. The Courts of Appeals for the Third and Fourth Circuits have adopted a modified test by linking the extent to which the terms of a transaction may permissibly deviate from industry practice to the duration of the relationship between debtor and creditor.
 
 See Advo-System,
 
 37 F.3d at 1050;
 
 Molded Acoustical,
 
 18 F.3d at 225. This embellishment aside, the thrust of § 547(e)(2)(C) under
 
 Tolona Pizza
 
 is clear. Assuming subsections (A) and (B) are satisfied, only when a payment is ordinary from the perspective of the industry will the ordinary course of business defense be available for an otherwise voidable preference. Defining the relevant industry is appropriately left to the bankruptcy courts to determine as questions of fact heavily dependent upon the circumstances of each individual case.
 
 See Molded Acoustical,
 
 18 F.3d at 224;
 
 Tolona Pizza,
 
 3 F.3d at 1033;
 
 Fred Hawes,
 
 957 F.2d at 246;
 
 see also Transue & Williams Stamping Co. v. Cleveland Screw Prods. Inc. (In re Transue & Williams Stamping Co.),
 
 Nos. 93-60269, 95-6044, 1995 WL 646834, at *4 (Bankr.N.D.Ohio Sept. 19, 1995);
 
 Milwaukee Cheese Wisconsin, Inc. v. Straus (In re Milwaukee Cheese Wisconsin, Inc.),
 
 191 B.R. 397 (Bankr.E.D.Wis.1995).
 

 This formulation is the most reasonable interpretation of § 547(e)(2)(C) because it balances the competing interests involved with respect to voidable preferences. The trustee’s power to avoid preferential transfers springs from a concern for the equitable treatment of all creditors as well as the desire to discourage creditors from hastily forcing troubled businesses into bankruptcy. As the legislative history indicates:
 

 The purpose of the preference section is two-fold. First, by permitting the trustee to avoid pre-bankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during [its] slide into bankruptcy. The protection thus afforded the debtor often enables [it] to work [its] way out of a difficult financial situation through cooperation with all of [its] creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of [its] class is required to disgorge so that all may share equally. The operation of the preference section to deter “the race of diligence” of creditors to dismember the debt- or before bankruptcy furthers the second goal of the preference section — that of equality of distribution.
 

 H.Rep. No. 595, 95th Cong., 1st Sess. 177-78 (1977),
 
 reprinted in
 
 1978 U.S.Code Cong. & Admin.News 5963, 6138. Referring directly to this legislative history, the Supreme Court has explained that:
 

 [T]he two policies are not entirely independent. On the one hand, any exception for a payment on account of an antecedent debt tends to favor the payee over other creditors and therefore may conflict with the policy of equal treatment. On the other hand, the ordinary course of business exception may benefit all creditors by deterring the “race to the courthouse” and enabling the struggling debtor to continue operating its business.
 

 Union Bank v. Wolas,
 
 502 U.S. 151, 160-61, 112 S.Ct. 527, 532-33, 116 L.Ed.2d 514 (1991). Preferences are disfavored because they are often made on the basis of which creditor is the most demanding or most favored rather than on the basis of fairness to all. As the Court of Appeals for the Third Circuit explained:
 

 The preference statute, by allowing the estate to recover in full — for the benefit of all the unsecured creditors — assets which a pushy unsecured creditor unilaterally plucked for itself or which a fawning debt- or used in an irregular transaction to advantage a favored creditor, seeks to fore
 
 *41
 
 close these tragedy-of-the-common type responses to a struggling business.
 

 Molded Acoustical, 18 F.3d
 
 at
 
 223.
 

 The ordinary course of business exception is consistent with the general thrust of preference law. The exception benefits all creditors by protecting payments received by those creditors who remain committed to a debtor during times of financial distress while at the same time affording a measure of flexibility to creditors in dealing with the debtor, provided that the steps taken are consistent with customary practice among industry participants. The approach taken by the court in
 
 Tolona Pizza
 
 flows naturally from the purpose of § 547(c)(2):
 

 The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor’s slide into bankruptcy.
 

 H.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977),
 
 reprinted in
 
 1978 U.S.Code Cong. & Admin.News 6329.
 

 The alternative to the objective inquiry adopted in
 
 Tolona Pizza
 
 is to look to the conduct of the parties themselves to determine if the terms of a preferential transfer are ordinary. This was the approach taken by the Court of Appeals for the Eleventh Circuit in
 
 Craig Oil. See also Graphic Prods. Corp. v. WWF Paper Corp. (In re Graphic Prods. Corp.),
 
 176 B.R. 65, 71-72 (Bankr.S.D.Fla.1994);
 
 Equipment Co. of America v. Production Supply Co. of Florida, Inc. (In re Equipment Co. of America),
 
 135 B.R. 169, 173 (Bankr.S.D.Fla.1991). Under this approach, whether a
 
 payment is
 
 made according to ordinary business terms is examined solely in the context of the ordinary terms between the particular debtor and creditor. But by treating both § 547(e)(2)(B) and (C) as subjective requirements and focusing entirely upon the conduct of the parties in question, the ordinary business terms requirement becomes surplusage. Congress could not have intended that one of the three separate requirements enacted to satisfy § 547(c)(2) was simply redundant.
 
 See, e.g., Tolona Pizza,
 
 3 F.3d at 1032.
 

 Moreover, a purely subjective approach which focuses solely on the prior dealings of the debtor and creditor does not adequately assure against inequitable treatment of those creditors not fortunate or prescient enough to establish a pattern of “ordinary” debt payments sufficiently in advance of an eventual bankruptcy. The court in
 
 Tolona Pizza
 
 alluded directly to this concern:
 

 The second possible function of [subsection (C) ] is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy.
 

 Tolona Pizza,
 
 3 F.3d at 1032.
 

 We agree with the reasoning of
 
 To-lona Pizza
 
 and hold that 11 U.S.C. § 547(c)(2)(C) requires a creditor to demonstrate that the terms of a payment for which it seeks the protection of the ordinary course of business exception fall within the bounds of ordinary practice of others similarly situated.
 

 B.
 

 Having determined the standard to be applied, we note that the Bankruptcy Court in this case did not engage in an objective analysis to determine whether Ford had demonstrated that the payment at issue comported with ordinary business terms in the industry. The Bankruptcy Court concluded, rather, that the terms could not possibly be ordinary because they arose from Roblin’s failure to abide by the terms of its account with Ford.
 
 See Roblin,
 
 127 B.R. at 725 (citing
 
 Craig
 
 Oil). We decline to adopt a rule that payments made pursuant to debt restructuring agreements, even when the debt is in default, can never be made according to ordinary business terms as a matter of law. That determination is a question of fact that depends on the nature of industry practice in each particular case, a factual inquiry that is appropriately left to the bankruptcy court.
 
 See Child World, Inc. v. Service Merchandise Co., Inc. (In re Child World, Inc.),
 
 173 B.R. 473, 478 n. 4 (Bankr.S.D.N.Y.1994);
 
 Sapir v. Keener Lumber Co., Inc. (In re
 
 
 *42
 

 Ajayem Lumber Corp.),
 
 143 B.R. 347, 353 (Bankr.S.D.N.Y.1992). It is not difficult to imagine circumstances where frequent debt rescheduling is ordinary and usual practice within an industry, and creditors operating in such an environment should have the same opportunity to assert the ordinary course of business exception.
 
 See, e.g., U.S.A. Inns,
 
 9 F.3d at 685 (regular practice in savings and loan industry to adopt payment plans for delinquent customers);
 
 Armstrong v. John Deere Co. (In re Gilbertson),
 
 90 B.R. 1006, 1012 (Bankr.D.N.D.1988) (deferral agreements common in retail farm implement sales industry). Indeed, if the industry practice is to restructure defaulted debt, it would make little practical sense to require creditors to comply with any other standard in order to meet the requirement of § 547(e)(2)(C).
 

 To apply properly the § 547(c)(2)(C) standard, “ordinary business terms” must include those terms employed by similarly situated debtors and creditors facing the same or similar problems. If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry. In this way, a creditor that agrees to restructure a debt in a manner consistent with industry practice in those circumstances does not lose the benefit of the exception. A creditor taking such steps should not be viewed as taking “unusual action” when it does no more than follow usual industry practice — precisely the kind of behavior the ordinary course of business exception was intended to protect. Restricting a creditor to courses of action typical in untroubled times leaves no room for realistic debt workouts and unfairly penalizes those creditors that take conventional steps to institute a repayment plan.
 
 See U.S.A. Inns,
 
 9 F.3d at 682-86;
 
 but see Meridith Hoffman Partners,
 
 12 F.3d at 1553-54.
 

 C.
 

 While the Bankruptcy Court did not perform the analysis dictated by the approach to § 547(c)(2)(C) we adopt today, the District Court did address both the subjective and objective aspects of the ordinary course of business exception, and it found no evidence of the industry standards that would have been required to support an ordinary course of business exception:
 

 The Court finds that the evidence supports the bankruptcy court’s conclusion that the payments were not made according to ordinary business terms. The record establishes that debtor contacted Ford and proposed the restructured payment agreement precisely because of its failure to pay the outstanding debt according to the original agreed upon terms. Moreover, the bankruptcy judge found the testimony of Roncolato established that the arrangement for payment of the delinquent debt was not part of an extension among all creditors, but was done in order to ensure debtor’s continued supply of scrap material from Ford.
 
 No evidence was presented that the restructuring of the debt and the resultant payments were consistent with the prior course of dealing between the parties or in accordance with customary business practice within the industry of which the parties are a part.
 

 Roblin II,
 
 slip op. at 11-12 (citations omitted) (emphasis added).
 

 Ford argues that the payments were made in accordance with ordinary business terms for several reasons. First, Ford argues that the repayment agreement itself had become the ordinary course of business for the two parties because for months prior to the bankruptcy, Roblin had made its payments when due without incident. Second, Ford contends that the ordinary course of business exception should apply because Ford took no unusual action to collect the debt from Roblin— no dunning calls were made, no collection letters sent, no litigation threatened. Third, Ford argues that the payments were made according to ordinary business terms because the repayment agreement was “inherently fair,” imposing an interest rate below the prevailing prime rate. Finally, Ford argues that Roblin’s own financial officer testified that similar arrangements were made with other suppliers, and that the terms of the agreement with Ford were consistent with the terms Roblin would have faced had it financed the debt with a third party. For all of these reasons, Ford argues that we should
 
 *43
 
 reverse the Bankruptcy Court’s finding that the payment did not comport with ordinary business terms.
 

 None of these arguments remedies Ford’s failure to introduce evidence of the ordinary practices of similarly situated firms. That failure of proof is fatal to Ford’s position.
 

 Ford’s first two arguments concern solely the dealings between the creditor and debtor in this case and do not relate to the objective inquiry into industry practice that is required to satisfy § 547(c)(2)(C). Ford’s third argument with respect to the prime interest rate does not solve Ford’s failure of proof because there is no evidence of how the interest rate charged here compared with other rates generally charged on restructured delinquent debt in the industry. Finally, with respect to the arrangements Roblin made with others, there is also evidence that some creditors did not restructure their debt with Roblin. Ford’s evidence did not establish ordinary business terms among Roblin’s creditors, much less demonstrate an objective industry practice as required by § 547(c)(2)(C).
 

 The evidence in this case is no more than the Court of Appeals for the Seventh Circuit found insufficient in
 
 In re Midway Airlines, Inc.,
 
 69 F.3d 792 (7th Cir.1995) (Ripple, J.). In that case a creditor appealed an adverse determination that certain payments would not be protected by the ordinary course of business exception because they were not made according to ordinary business terms. The creditor had not offered any evidence of industry practice, relying instead on the conduct of the debtor both with respect to the creditor itself and the debtor’s other suppliers. The Court affirmed, holding that “proof of the parties’ own relationship is insufficient.” Id., 69 F.3d at 799. The Court explained that “[rjeliance solely on the experience of the creditor renders ineffectual the important dichotomy between the subjective requirements of 11 U.S.C. § 547(c)(2)(A)-(B), which can be satisfied through proof of the parties’ own dealings, and the objective requirement imposed by 11 U.S.C. § 547(c)(2)(C), which requires reference to some external datum.” Id., 69 F.3d at 797-98.
 

 The court in
 
 Midway Airlines
 
 relied, in turn, on another thoughtful decision on this point. In
 
 Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.),
 
 957 F.2d 239 (6th Cir.1992)
 
 (Rosen,
 
 J.), the Court of Appeals for the Sixth Circuit addressed the question of whether proof of industry standards was possible without examining practices beyond those of the parties in question. The Court acknowledged that:
 

 [I]n looking at industry standards, a court may also refer to the manner in which the parties conduct their business with other, unrelated parties. This evidence alone, however, is insufficient to prove “ordinary business terms” by a preponderance of the evidence.
 

 Id.,
 
 957 F.2d at 246 n. 7. The Court recognized that “courts do not look only at the manner in which one particular creditor interacted with other similarly situated debtors, but rather analyze whether the particular transaction in question comports with the standard conduct of business within the industry.”
 
 Id.,
 
 957 F.2d at 246.
 

 We agree with the proposition that the behavior of the parties cannot be sufficient in and of itself to sustain the creditor’s burden of proof with respect to ordinary business terms in the industry. To permit a creditor to rely solely on such evidence would, in effect, shift the burden to the trustee to offer evidence that other industry participants behaved otherwise. The burden of proof to show industry practice, however, is on the creditor who seeks to retain a payment at the expense of the other creditors.
 
 See D.J. Management,
 
 164 B.R. at 838 (“Other creditors who wait for payment are entitled to the benefit of the fact that it is the preferred creditor who must convince the Court that nothing ‘idiosyncratic’ was going on.”).
 

 Applying these principles to this case, we are convinced that Ford did not sustain its burden of proof at trial. No evidence of industry practice or custom apart from Rob-lin’s own experience was introduced. In this ease, because the record before us yields no other result but the one reached below, the proper course is to affirm.
 
 See Molded Acoustical,
 
 18 F.3d at 222 n. 7.
 

 
 *44
 
 CONCLUSION
 

 For the foregoing reasons, we affirm the order of the District Court affirming the judgment of the Bankruptcy Court in favor of the Trustee to recover Roblin’s April 2, 1985 payment to Ford of $53,320.78 as a preferential transfer voidable under 11 U.S.C. § 547.
 

 Affirmed.
 

 [1]
 

 . The District Court correctly found, and the parties do not dispute, that for purposes of determining whether a transfer was made within the 90 day preference period, a transfer by check is deemed to occur on the date the check is honored rather than the date received by the payee.
 
 See Barnhill v. Johnson,
 
 503 U.S. 393, 400, 112 S.Ct. 1386, 1390, 118 L.Ed.2d 39 (1992).
 

 [2]
 

 . Ford counterclaimed below for the return of two other payments made to Ford in May and June 1985 which Ford allegedly returned to Rob-lin by mistake. Having determined that the April 1985 payment was a preferential transfer, the Bankruptcy Court dismissed the counterclaims because the later payments were also preferential transfers.
 
 See Roblin,
 
 127 B.R. at 725. The District Court affirmed.
 
 See In re Roblin Indus., Inc.,
 
 91 CV 523A, at 13 (W.D.N.Y. Mar. 29, 1995). For the same reasons that we affirm the judgment ordering the return of Roblin's April 1985 payment to Ford, we affirm the dismissal of Ford's counterclaims.