**In re ICE CREAM LIQUIDATION, INC. f/k/a Fieldbrook Farms, Inc., Debtor.**

**Ice Cream Liquidation, Inc. f/k/a Fieldbrook Farms, Inc., Plaintiff,**

v.

**Niagara Mohawk Power Corp., Defendant.**

**Bankruptcy No. 01–34624(LMW).**
**Adversary No. 03–3047.**

United States Bankruptcy Court, D. Connecticut.

Feb. 8, 2005.

---

Barry S. Feigenbaum, Esq., Rogin, Nassau, Caplan, Lassman & Hirtle, LLC, Hartford, CT, for Plaintiff/Debtor.

Timothy J. Walker, Esq., Hiscock & Barclay, LLP, Buffalo, NY, Patrick M.

Birney, Esq., Gregory R. Faulkner, Esq., Halloran & Sage, LLP, Hartford, CT, William C. Grossman, Esq., Niagara Mohawk Power Company, A National Grid Company, Buffalo, NY, for Defendant.

## MEMORANDUM OF DECISION RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

LORRAINE M. WEIL, Bankruptcy Judge.

The matters before the court are the above-referenced plaintiff's (the "Debtor") and the above-referenced defendant's ("Niagara Mohawk") cross-motions for summary judgment in this adversary proceeding.[1] The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This proceeding is a "core proceeding" within the purview of 28 U.S.C. § 157(b).

## I. PROCEDURAL BACKGROUND

### A. The Bankruptcy Case

The underlying chapter 11 case was commenced by a petition filed by the Debtor[2] on September 21, 2001 (the "Petition Date"). Pursuant to 11 U.S.C. §§ 1107 and 1108, the Debtor continued to operate its business as a debtor in possession. By order (Case Doc. I.D. No. 395) dated August 13, 2002, the court confirmed the Modified First Amended Joint Liquidating Plan of Reorganization (Case Doc. I.D. No. 394, the "Plan") in this case.[3] Among other things, the Plan reserved to the Debtor the authority to "prosecute any claims under Sections ... 547 ... and 550 of the [Bankruptcy] Code." (Plan § 5.2(c).) In connection with Plan confirmation, the Debtor assumed and assigned to FAI a certain executory contract (the "NYPA Contract") among the New York Power Authority ("NYPA") and Niagara Mohawk (the precise role of each such entity under the NYPA Contract is unclear), and the Debtor, as purchaser, with respect to certain low cost electric power. (See Case Doc. I.D. No. 209, the "Assumption Order") (assumed contract number 99). Pursuant to the relevant purchase agreement, FAI was required to (and did) cure then-outstanding payment defaults (the "Cure Payment") with respect to the NYPA Contract in an amount agreed upon by Niagara Mohawk/NYPA and FAI.

### B. The Adversary Proceeding

In accordance with Section 5.2(c) of the Plan, the Debtor commenced the instant

1. References herein to the docket of the above-referenced chapter 11 case are in the following form: "Case Doc. I.D. No. ____." References herein to the docket of the above-referenced adversary proceeding are in the following form: "A.P. Doc. I.D. No. ____." Niagara Mohawk's summary judgment motion appears in the docket of this adversary proceeding as A.P. Doc. I.D. No. 22 (the "Defendant's Motion"). The Debtor's summary judgment motion appears in the docket of this adversary proceeding as A.P. Doc. I.D. No. 29 (the "Debtor's Motion"). The Defendant's Motion and the Debtor's Motion are hereafter referred to, collectively, as the "Motions."

2. The bankruptcy case was commenced by an entity called "Fieldbrook Farms, Inc." ("Fieldbrook"). By order (Case Doc. I.D. No. 210) dated December 20, 2001, Fieldbrook sold all or substantially all of its assets (as described in the order) to Fieldbrook Acquisition, Inc. ("FAI"). One of the assets sold was the Debtor's name. By notice (Case Doc. I.D. No. 234), counsel for the Debtor notified the court of the name change of Fieldbrook to Ice Cream Liquidation, Inc. By order (Case Doc. I.D. No. 250) dated February 21, 2002, the court granted the Debtor's request to amend the caption in the chapter 11 case to reflect the Debtor's new name, Ice Cream Liquidation, Inc. For simplicity's sake, the court will use the term "the Debtor" without regard to the legal name of the entity at the time.

3. The Effective Date of the Plan was September 12, 2002. (See Case Doc. I.D. No. 422.)

adversary proceeding by the filing of a complaint (A.P. Doc. I.D. No. 1, the "Complaint") on March 31, 2003. The Complaint seeks avoidance under 11 U.S.C. § 547(b) (and recovery under 11 U.S.C. § 550) of certain allegedly "preferential" transfer payments (the "Transfers") made by the Debtor to Niagara Mohawk. Niagara Mohawk filed an Answer and Affirmative Defenses to Adversary Complaint (A.P. Doc. I.D. No. 11, the "Answer") on May 16, 2003. The Answer admits none of the material allegations of the Complaint. The Answer also alleges the following relevant affirmative defenses:

- "Under the provisions of § 547(c)(2) of the Bankruptcy Code, the [T]ransfers may not be avoided because they were made 'in the ordinary course of business' [the "Ordinary Course Defense"] ...." (Answer at 2.)
- "Under the provisions of § 547(c)(4) of the Bankruptcy Code, the [T]ransfers cannot be avoided because the defendant 'gave new value to or for the benefit of the debtor' [the "New Value Defense"]." (Answer at 2.)

Niagara Mohawk filed the Defendant's Motion on August 22, 2003. Niagara Mohawk supported the Defendant's Motion with numerous attached exhibits, with a statement as required by Local Rule 56(a)1 (A.P. Doc. I.D. No. 23, the "Defendant's Statement") filed simultaneously with its motion, and with a brief in support. The Defendant's Motion seeks summary judgment on the Ordinary Course Defense and the New Value Defense. In addition, the Defendant's Motion seeks

summary judgment to the extent that the Transfers were payments due under the NYPA Contract (the "NYPA Defense").

On September 18, 2003, the Debtor filed the Debtor's Motion seeking summary judgment against Niagara Mohawk in the amount of $557,793.55. The Debtor supported the Debtor's Motion with a statement as required by Local Rule 56(a)1 (A.P. Doc. I.D. No. 28, the "Debtor's Statement"). The Debtor also supported the Debtor's Motion with a brief in support, and with the affidavit of Roy E. Filkoff (A.P. Doc. I.D. No. 31, the "Filkoff Affidavit").[4] In addition, the Debtor's Statement also constituted the counter-statement to the Defendant's Statement required by Local Rule 56(a)2. Niagara Mohawk filed a counter-statement to the Debtor's Statement as required by Local Rule 56(a)2 on October 6, 2003. (See A.P. Doc. I.D. No. 37.)[5] Both sides filed various responsive briefs.

Oral argument was had on the Motions at a hearing (the "Hearing") held on June 4, 2004. At the Hearing, counsel for the Debtor submitted to the court (with the consent of Niagara Mohawk but subject to certain reservations stated on the record) certain additional exhibits in support of the Debtor's Motion. To make those exhibits part of the record, on June 7, 2004, the court issued that certain Order Deeming Exhibits Submitted at Summary Judgment Hearing To Be Incorporated into Debtor's Submission in Support of Motion for Summary Judgment (A.P.Doc. I.D. No. 46) to which copies of those additional exhibits

4. Mr. Filkoff is a financial consultant and principal of Altman and Company, the management consultant retained by the Debtor in this chapter 11 case (see Case Doc. I.D. No. 81). Prior to his association with the Altman firm, Mr. Filkoff was the chief financial officer of Fieldbrook for two years.

5. All of the above-described Local Rule 56(a) statements and counter-statements are referred to herein, collectively, as the "Statements." Some of the Statements refer to "Local Rule 9," the predecessor to Local Rule 56. Comparing the Debtor's Statement to the Defendant's Statement, those Statements agree on very little.

(the "Additional Exhibits") were annexed. At the Hearing, the parties also agreed as follows (the "Stipulations"):

- the amount of the Transfers (including Transfers in respect of the NYPA Contract) made by the Debtor to Niagara Mohawk during the Preference Period (as hereafter defined) was $724,023.59 (*see* Additional Exhibits (Summary of Plaintiff's Revised Claim));

- before an adjustment (the "NYPA Adjustment") in some (perhaps disputed) amount related to the NYPA Defense [6] and a potential (disputed) adjustment with respect to the Security Deposit (as hereafter defined), the amount of the New Value Defense is $505,518.99 (*see id.*); and

- the NYPA Defense is a valid defense in some disputed amount.

At the conclusion of the Hearing, the court took the Motions under advisement.

After due consideration of the Motions (with exhibits), the Statements, the Filkoff Affidavit, the Additional Exhibits, the various memoranda of law filed by the parties, arguments of counsel at the Hearing, and the respective case files for this chapter 11 case and this adversary proceeding, this court now is prepared to render this decision on the Motions.

## II. *FACTUAL BACKGROUND*

At all relevant times, the Debtor was engaged in the business of manufacturing and distributing ice cream products and novelties. Niagara Mohawk is a utility company regulated by the New York Department of Public Service (the "DPS") in the business of transmitting and delivering electric and gas services to customers in New York State. The Debtor operated an ice cream products manufacturing facility in New York State. In connection therewith, the Debtor purchased electric power other than pursuant to the NYPA Contract (the "Non–NYPA Power") from Niagara Mohawk from time to time prior to the Petition Date. Invoices for the Non–NYPA Power were rendered to the Debtor by Niagara Mohawk on a monthly basis and certain Transfers were made by the Debtor to Niagara Mohawk on account of those invoices. Also in connection with its New York facility, the Debtor purchased power (the "NYPA Power") under the NYPA Contract from Niagara Mohawk and/or NYPA from time to time prior to the Petition Date. Invoices for the NYPA Power were rendered to the Debtor by Niagara Mohawk on a monthly basis and certain Transfers were made by the Debtor to Niagara Mohawk on account of those invoices.[7] At some time during the prepetition period, the Debtor posted a certain deposit (with interest accrued thereon, the "Security Deposit") with Niagara Mohawk to secure payment of the Debtor's utility account(s).

For some time prior to January, 2000, the Debtor was delinquent on its account(s) with Niagara Mohawk for electric power provided. In or about January, 2000, Niagara Mohawk sent the Debtor a termination notice. On or about March 20, 2000, the Debtor entered into a certain

---

6. The court has been given insufficient information with respect to the NYPA Adjustment to the amount of the New Value Defense to enable the court to deal with that adjustment herein.

7. The amount and rate of energy purchased by the Debtor in respect of NYPA Power and Non–NYPA Power were specifically identified and contained in a single monthly invoice to the Debtor. (*See* A.P. Doc. I.D. No. 22, Exhibit E ("ST–46 hydro power" refers to NYPA Power and "additional at SC–4" designates Non–NYPA Power).)

"Account Agreement" effective as of January 1, 2000 (*see* A.P. Doc. I.D. No. 22, Exhibit I, the "First Agreement") to address that delinquency. The fully executed First Agreement was transmitted to the Debtor under cover of correspondence on DPS/Public Service Commission (the "PSC") letterhead, dated March 16, 2000 and signed by:

Donna M. De Vito

Business Advocate

Office of Consumer Education and Advocacy

(*See* A.P. Doc. I.D. No. 22, Exhibit I.) Pursuant to the First Agreement, the Debtor was to make the following weekly payments: $51,800.00 per week from January 21, 2000 through March 31, 2000; and $90,000.00 per week from April 7, 2000 through April 28, 2000.

At the end of the First Agreement, the Debtor remained in default. As a result, on or about February 26, 2001 the Debtor and Niagara Mohawk entered into another agreement (*see* A.P. Doc. I.D. No. 22, Exhibit J, the "Second Agreement") to address the delinquency. The Second Agreement was set forth in a document bearing Niagara Mohawk's letterhead and, on its face, was executed on behalf of the Debtor, Niagara Mohawk and the PSC. (*See id.*) Pursuant to the Second Agreement, the Debtor was to make the following payments: $35,000 on January 5, 2001, January 16, 2001, January 23, 2001 and February 9, 2001; and $35,039.88 on February 6, 2001.[8]

At the end of the Second Agreement, the Debtor remained in default. The Preference Period (as defined below) in this case commenced in late June, 2001. On or about July 3, 2001, Ms. Devito sent an email to Niagara Mohawk which stated in relevant part as follows: "It is directed that no further termination activities be made by [Niagara Mohawk] ... to ... [the Debtor] until the PSC has reviewed the account ...." (A.P. Doc. I.D. No. 22, Exhibit K.) That email was acknowledged by Niagara Mohawk by email later that day. (*See id.*). Subsequently, the parties discussed a third repayment agreement. With respect to those discussions, Niagara Mohawk has produced a document dated July 30, 2001 on Niagara Mohawk letterhead but executed (on its face) only on behalf of the PSC. (*See* A.P. Doc. I.D. No. 22 Exhibit L, the "Third Agreement"). Pursuant to the Third Agreement, the Debtor was to make weekly payments in the amount of $88,000 until August 31, 2001. Niagara Mohawk claims that the Third Agreement became effective among the parties. The Debtor disputes that the Third Agreement became effective but appears to have made payments generally consistent with the Third Agreement until some time in August, 2001. (For present purposes only, the court will assume that the Third Agreement became effective.[9])

The Debtor defaulted under the Third Agreement [10] and shortly thereafter commenced this chapter 11 case. Niagara Mohawk asserts that it was required to enter into the Deferred Payment Agreements pursuant to applicable DPS regulations. *Cf.* 16 N.Y.C.R.R. §§ 13.5(b)(2), (c) and (d) (see Annex A hereto). The Debtor contests the foregoing. It is undisputed that

---

8. The Debtor appears to have made $142,233.72 in payments during the month of December, 2000 pursuant to the Second Agreement but prior to its execution.

9. The First Agreement, the Second Agreement and the Third Agreement are hereafter referred to, collectively, as the "Deferred Payment Agreements."

10. The last payment in good funds appears to have been made around mid-August, 2001.

Niagara Mohawk continued to supply electrical service to the Debtor during the Preference Period (as hereafter defined).

## III. ANALYSIS

### A. Summary Judgment Standard

"Summary judgment is appropriate only if the pleadings and submissions ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 166 (2d Cir.1999). *See also* Fed. R.Civ.P. 56(c) (made applicable by Fed. R. Bankr.P. 7056). The movant bears the burden of establishing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("T[h]e burden on the moving party may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case."). The court must view all ambiguities and draw all reasonable inferences in the light most favorable to the nonmovant. *See Novak v. Blonder (In re Blonder)*, 246 B.R. 147, 150 (Bankr. D.Conn.2000) (Krechevsky, J.). Ultimately, the role of the court is "not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However,

> in most situations in which the moving party seems to have discharged his burden of demonstrating that no genuine issue of fact exists, the court has discretion to deny a Rule 56 motion. This is appropriate since even though the summary-judgment standard appears to have been met, the court should have the freedom to allow the case to continue when it has any doubt as to the wisdom of terminating the action prior to a full trial.

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2728 at 525–26 (3d ed.1998) (footnotes omitted). *Accord Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505; *Lind v. United Parcel Service, Inc.*, 254 F.3d 1281, 1285 (11th Cir.2001).

### B. Preferential Transfer under Bankruptcy Code § 547(b)

Niagara Mohawk does not argue that the Transfers do not satisfy Bankruptcy Code § 547(b).[11] Rather, as noted above,

---

11. Section 547 provides in pertinent part as follows:

> . . . . .
>
> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing of the petition [the "Preference Period"]; ... and
> (5) that enables such creditor to receive more than such creditor would receive if—

> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
>
> . . . . .
>
> (g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section ....

11 U.S.C.A. § 547 (West 2005). Niagara Mohawk alleges that the Preference Period in this case commenced on June 23, 2001. (*See* A.P. Doc. I.D. No. 22, Exhibit C ¶ 2.) The Debtor alleges that the Preference Period commenced on June 26, 2001. (*See* A.P. Doc.

Niagara Mohawk asserts the following affirmative defenses: the Ordinary Course Defense, the New Value Defense and the NYPA Defense. As a consequence of the Stipulations, the only disputed issues now before the court with respect to the Motions are:

- the Ordinary Course Defense;
- whether the amount of the New Value Defense must be reduced by the Security Deposit;[12] and
- the proper calculation of the amount of the NYPA Defense

C. *Ordinary Course Defense under Bankruptcy Code § 547(c)*

■■ Section 547 provides in pertinent part as follows:

. . . . .

(c) The trustee may not avoid under this section a transfer—

. . . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms . . . .

(g) For the purposes of this section, . . . the creditor . . . against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

11 U.S.C.A. § 547 (West 2005). Niagara Mohawk bears the burden of proving each of the three elements of Section 547(c)(2) by a preponderance of the evidence. *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 39 (2d Cir. 1996). At least with respect to the defendant creditor's motion for summary judgment, " 'the general rule is that the ordinary course of business defense cannot be determined on a motion for summary judgment.' " *Hoffman v. Associates Commercial Corp. (In re Durette)*, 228 B.R. 70, 75 (Krechevsky, J.) (citation omitted; alteration in original).

There is no dispute that the debt for which the Transfers were made was incurred by the Debtor in the ordinary course of business pursuant to Bankruptcy Code § 547(c)(2)(A). However, the Debtor does dispute whether Niagara Mohawk has satisfied subsections (c)(2)(B) and (c)(2)(C).

1. *Bankruptcy Code § 547(c)(2)(B)*

■■ Bankruptcy Code § 547(c)(2)(B) "requires a subjective examination of whether a transfer was ordinary between the parties to the transfer, meaning whether the payments were consistent with the course of dealings between the particular parties." *McCarthy v. Navistar Financial Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 34 (N.D.N.Y.1997), *aff'd*, 142 F.3d 571 (2d Cir.1998) (citations and internal quotation marks omitted).

There is no precise legal test that can be applied in determining whether payments by the debtor during the . . . [Preference Period] were made in the ordinary course of business; "rather, the court must engage in a 'peculiarly factual' analysis."

5 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 547.04[2][a][ii][B]

---

I.D. No. 1 ¶ 8.) It is not necessary now for the court to resolve that dispute.

**12.** *But see* note 6, *supra*.

at 547–58 (15th ed. rev.2004) (footnote omitted). "The determination is based on the surrounding facts, and include such factors as 'the history of the parties' dealings with each other, timing, amount at issue, and the circumstances of the transaction.'" *Swallen's, Inc. v. Corken Steel Products Co. (In re Swallen's, Inc.)*, 266 B.R. 807, 813 (Bankr.S.D.Ohio 2000) (citation omitted).

■ Niagara Mohawk implies that *Roblin Industries* and *Bulan v. Niagara Mohawk Power Corp. (In re Al Cohen's Rye Bread Bakery)*, 202 B.R. 546 (Bankr. W.D.N.Y.1996) (discussed at length below), require that summary judgment be rendered in its favor on the Section 547(c)(2)(B) issue with respect to Transfers made pursuant to the Deferred Payment Agreements.[13] However, both *Roblin Industries* and *Al Cohen's* were Section 547(c)(2)(C) cases; they are inapposite for Section 547(c)(2)(B) purposes.[14]

Based upon the foregoing, the court deems it appropriate to leave the Section 547(c)(2)(B) issue for trial.

### 2. *Bankruptcy Code § 547(c)(2)(C)*

■ The United States Court of Appeals for the Second Circuit has held that the term "ordinary business terms" in Bankruptcy Code § 547(c)(2)(C) "requires a creditor to demonstrate that the terms of a payment for which it seeks the protection of the ordinary course of business exception fall within the bounds of ordinary practice of others similarly situated." *Roblin Industries*, 78 F.3d at 41. "If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry." *Id.* at 42. The *Roblin Industries* court further instructed:

> Under this standard, a creditor must show that the business terms of the transaction in question were "within the outer limits of normal industry practices," *id.*, in order to satisfy the third element of § 547(c)(2). The conduct of the debtor and creditor are considered objectively in light of the industry practice .... Defining the relevant industry is appropriately left to the bankruptcy courts to determine as questions of fact heavily dependent upon the circumstances of each individual case .... The burden of proof to show industry practice, however, is on the creditor who seeks to retain a payment at the expense of the other creditors.

*Roblin Industries*, 78 F.3d at 39–40, 43. The court must be able to determine "that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue. Otherwise, the practice cannot be considered an 'ordinary' way of dealing with debtors." *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 369 (5th Cir.2002).

■ The term "ordinary business terms" within the relevant industry is not limited to a "single, uniform set of business terms" but "refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that

---

**13.** Some of the Transfers appear not to have been made pursuant to the Deferred Payment Agreements.

**14.** Nevertheless, a fair extension of *Roblin Industries* is that the fact that payments were made on a defaulted debt pursuant to a restructuring agreement is not *per se* disqualifying for Section 547(c)(2)(B) purposes. *Cf. Arrow Electronics, Inc. v. Justus (In re Kaypro)*, 218 F.3d 1070 (9th Cir.2000) (same). *See also In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr.W.D.Okla.1986) (nineteen month-old debt restructuring established a new "ordinary course" between the parties).

only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993) (emphasis in original). *See also Gulf City Seafoods,* 296 F.3d at 369 (ultimate inquiry is whether credit arrangement "is so out of line with what others [in the relevant industry] do"); *Roblin Industries,* 78 F.3d. at 40 (creditor must show that business terms are "within the outer limits of normal industry practices") (citation and internal quotation marked omitted); *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.),* 18 F.3d 217, 226 (3d Cir.1994) ("[D]epartures from th[e] relevant industry's norms which are not so flagrant as to be 'unusual' remain within subsection C's protection.").

As noted above, Niagara Mohawk asserts that it was required to enter into the Deferred Payment Agreements pursuant to applicable DPS regulations. Accordingly, Niagara Mohawk argues, under the *Al Cohen's* case Transfers made pursuant to the Deferred Payment Agreements (specifically, the Third Agreement) satisfy Section 547(c)(2)(C) as a matter of law. In *Al Cohen's,* Niagara Mohawk and the debtor agreed in late 1993 to a deferred payment arrangement whereby the debtor would satisfy accumulated arrearages through payment of an additional $1,000 each month with the payment of its then-current utility bill. *Al Cohen's,* 202 B.R. at 547. As an "eligible" customer, the debtor was able to obtain that arrangement pursuant to a DPS regulation (16 N.Y.C.R.R. § 13.5) ("Section 13.5") which required Niagara Mohawk to offer a deferred payment arrangement to an "eligible" customer prior to termination of service. *Id.* at 548. The debtor performed pursuant to that arrangement for nine months until shortly

before creditors filed an involuntary bankruptcy petition against the debtor. The debtor defaulted in opposing the involuntary petition and the bankruptcy court entered an order for relief under chapter 7 of the Bankruptcy Code. *Al Cohen's,* 202 B.R. at 547.

The chapter 7 trustee sought to recover, as preferences, payments made by the debtor during the preference period pursuant to the deferred payment arrangement. Niagara Mohawk moved for summary judgment asserting (among other things) an affirmative defense under Section 547(c)(2). The *Al Cohen's* court noted that the "focus of ... [the parties'] dispute is ... whether payment was made according to ordinary business terms." *Id.* at 548. The court concluded that Niagara Mohawk *had* established the Section 547(c)(2)(C) prong as a matter of law and granted the summary judgment motion, reasoning as follows:

> The regulations of the ... [DPS] provide that prior to any "termination of service for nonpayment of arrears," a utility must advise the customer of its eligibility for a deferred payment arrangement. 16 N.Y.C.R.R. § 13.5(1)(i). Having satisfied the regulation's definition of eligibility, Al Cohen's Rye Bread Bakery, Inc., could properly demand the restructuring of its obligations. The deferred payment arrangement, therefore, constituted an ordinary term of business within the utility industry. Required to accept the payments and to defer its collection activity, [Niagara Mohawk] ... has fully established the subdivision (c)(2) defense to the preference provisions of section 547.

*Al Cohen's,* 202 B.R. at 548–49.

To the extent that *Al Cohen's* holds that when the procedure of Section 13.5 [15] is applicable and proper Section 13.5

---

15. The full text of Section 13.5 is set out in

Annex A hereto. Assuming that Section 13.5

procedure produces the relevant "deferred payment agreement" (including an agreement on "more generous terms"), payments made pursuant to that agreement are *per se* within the purview of Section 547(c)(2)(C), this court concurs. Nevertheless, on this record the court declines to enter summary judgment on that issue. What constitutes proper Section 13.5 procedure is a question of law (although subject to proof). Whether the procedure employed here comported with such proper regulatory procedure is a question of fact. Moreover, as noted above, there are disputes as to whether Section 13.5 applies here at all and as to whether the Third

Agreement ever became effective. The court defers resolution of all those questions to a trial on the merits.[16]

### D. *Security Deposit*

■ Because the Debtor concedes that the New Value Defense is valid pursuant to Bankruptcy Code § 547(c)(4),[17] the Debtor may not recover from Niagara Mohawk to that extent. However, the foregoing is subject to the limitation that the Security Deposit does not secure and has not been applied to the "new value" debt. *See* 11 U.S.C. § 547(c)(4). *See also Southern Technical College, Inc. v. Graham Properties Partnership (In re Southern*

---

applies to a situation, the utility is required to offer the defaulting customer "a deferred payment agreement [and every offer of such agreement] shall ... set forth generally the minimum terms to which such customer is entitled ... [and] explain that more generous terms may be possible," Section 13.5(c)(1). The "minimum terms" consist of the mandatory provision of Section 13.5(d)(1) (requiring "timely payments of all current charges") and the other terms set forth in Section 13.5(d)(2) and (3). The "more generous terms" are contemplated by Section 13.5(d)(4) which provides:

 [A] deferred payment agreement may provide for a greater or lesser down payment, a longer or shorter period of time, and payment on any schedule, if mutually agreed upon by the parties.

16 N.Y.C.R.R. § 13.5(d)(4) (2004). Niagara Mohawk concedes that the Debtor was not an "eligible customer" within the purview of Section 13.5 entitled to the offer of a "deferred payment agreement." However, Niagara Mohawk argues that it nevertheless was required to offer the Debtor a "deferred payment agreement" pursuant to Section 13.5(b)(2). The court would require more evidence of procedure under Section 13.5(b)(2) (and the procedure followed in this instance) before the court could find that Niagara Mohawk was required to offer a "deferred payment agreement" to the Debtor pursuant to that subsection. However, for the limited purpose of determining Section 13.5's effect in a Section 547(c)(2)(C) context when Section 13.5 applies, the court will as-

sume that Niagara Mohawk was required by Section 13.5 to offer a deferred payment agreement to the Debtor.

**16.** To the extent (if any) that *Al Cohen's* is inconsistent with the foregoing, the court respectfully declines to follow *Al Cohen's*. As guidance for the parties for trial, the court notes that Niagara Mohawk retains the option of proving its satisfaction of Section 547(c)(2)(C) *without* recourse to Section 13.5 and that Niagara Mohawk has made out a *prima facie* case that the relevant industry is composed of utilities subject to regulation by the DPS. *Cf. Molded Acoustical Products, Inc.,* 18 F.3d at 226 ("[S]ubsection C allows the creditor considerable latitude in defining what the relevant industry is ....").

**17.** Bankruptcy Code § 547(c) provides in relevant part as follows:

 (c) The trustee may not avoid under this section a transfer—

 . . . . .

 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

 (A) *not secured by an otherwise unavoidable security interest;* and

 (B) on account of which new value the debtor did not make *an otherwise unavoidable transfer to or for the benefit of such creditor* ....

11 U.S.C.A. § 547(c) (West 2005) (emphasis added).

*Technical College, Inc.)*, 199 B.R. 46, 50 (Bankr.E.D.Ark.1995) *(citing, inter alia, Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.)*, 393 F.2d 60 (2d Cir.), *cert. denied*, 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968)). The Debtor argues that the "new value" debt is secured *pro tanto* by the Security Deposit. Niagara Mohawk argues that the Security Deposit should be applied first to unpaid invoices ("Early Invoices") relating to pre-"new value" utility services. That application, Niagara Mohawk argues, would leave the "new value" invoices entirely or substantially unsecured and no (or little) adjustment to the amount of the New Value Defense would be necessary. If well grounded factually, applicable law seems to support that argument. *See, e.g., L & B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 91 (2d Cir.1998) ("As a *general rule,* payment is applied to debts in the order in which they accrue." (emphasis added)).[18]

However, the Debtor argues that Niagara Mohawk's position is *not* well grounded factually. The Debtor argues that the amount of the New Value Defense must be reduced by all (or substantially all) of the amount of the Security Deposit. The Debtor's argument (as the court understands it) is that the Early Invoices have been satisfied in their entirety or in substantial part. Accordingly, the Debtor argues, all (or substantially all) of the debt secured by the Security Deposit (or satisfied from the Security Deposit)[19] is debt relating to the "new value" utility services rendered during the Preference Period. If the foregoing is true, those services are disqualified as "new value" under Bank-

ruptcy Code § 547(c)(4) and the amount of the New Value Defense must be adjusted (downward) accordingly.

Summary judgment is inappropriate on the Security Deposit issue because supporting calculations showing application (or lack of application) of payments to the Early Invoices must be set before the court in writing and with reasonable precision (something not yet done). Moreover, there is a further question of fact because application of payments is a function of the intention and acts of the debtor and/or the creditor and the "general rule" may not always apply. *See, e.g.,* 82 N.Y. Jur.2d *Payment and Tender* §§ 59–71 (2004).

For the foregoing reasons, the court deems the Security Deposit issue best left for trial.

### E. *NYPA Defense*

 Each challenged Transfer appears to contain charges for NYPA Power. The Debtor concedes that, because the NYPA Contract was assumed (and assigned) in this case pursuant to Bankruptcy Code § 365, that portion of the Transfers attributable to payments ("NYPA Payments") due for the NYPA Power cannot be avoided as preferences. *Cf. In re Superior Toy & Manufacturing Co., Inc.*, 78 F.3d 1169 (7th Cir.1996). *See also Eastern Air Lines, Inc. v. Insurance Company of the State of Pennsylvania (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992 (2d Cir.1996). What is contested here is how the Transfers should be apportioned between NYPA Payments and non-NYPA Payments (*i.e.,* the calculation of the amount of the NYPA Defense).

---

18. For present purposes, the court assumes that New York substantive law governs issues relating to application of payments.

19. Niagara Mohawk's Exhibit F suggests that the Security Deposit was applied on October

9, 2001. (*See* A.P. Doc. I.D. No. 22, Exhibit F.) However, in its counter-statement, Niagara Mohawk denied that the Security Deposit had been applied on or after the Petition Date. (*See* A.P. Doc. I.D. No. 37 ¶ 7.)

Niagara Mohawk asserts that apportionment of the Transfers between NYPA Payments and non-NYPA Payments should be calculated on a 15.87% to 84.13% ratio (the "Cure Payment Ratio") *as a matter of law*. Niagara Mohawk's argument is as follows. The Cure Payment was agreed upon by the parties and calculated at 15.87% of then outstanding invoices (*i.e.*, the Cure Payment Ratio) based upon the Debtor's historical average usage of NYPA Power and non-NYPA Power over a twelve-month period (beginning with August, 2000). (*See* A.P. Doc. I.D. No. 22, Exhibit M (correspondence dated October 10, 2001 with attachment).) Niagara Mohawk argues that the Debtor did not object to the Cure Payment Ratio then, and should be bound to it now as a matter of law.

The court finds Niagara Mohawk's Cure Payment Ratio argument unpersuasive. The court's view might be different if the Cure Payment Ratio (or, perhaps, even only the amount of the Cure Payment) had been stated in the Assumption Order, but it was not. The amount of the Cure Payment was agreed to (and paid by FAI) outside of the presence of the court. The record as it now stands is insufficient for this court to rule that, as a matter of law, the Cure Payment Ratio must be used in calculating the amount of the NYPA Defense. There may be facts surrounding the negotiations that produced the amount of the Cure Payment which would justify holding the Debtor to the Cure Payment Ratio now, or it may be otherwise demonstrated to the court that the Cure Payment Ratio is the most appropriate formula for calculating the amount of the NYPA Defense. However, such matters are best left for trial.[20]

20. The parties are asked to address at trial who bears the burden of production and the risk of nonpersuasion on this issue.

## IV. CONCLUSION

For the reasons set forth above, marginal orders will enter denying the Motions.

### ANNEX A (16 N.Y.C.R.R. § 13.5)

13.5 Deferred payment agreements

(a) *Utility's obligations.*

(1) A utility shall provide a written notice offering a deferred payment agreement in accordance with this section to an eligible customer at the following times:

(i) not less than five calendar days before the date of a scheduled termination of service for nonpayment of arrears, as indicated on a final termination notice, or eight calendar days if mailed, · provided the customer has been a customer for at least six months and the arrears on which the outstanding termination notice is based exceed two months' average billing; and

(ii) when it renders a backbill, which exceeds the cost of twice the customer's average monthly usage of $100, whichever is greater; provided, however, that a utility shall not be required to offer an agreement when the customer knew, or reasonably should have known, that the original billing was incorrect.

(2) If a utility and a customer agree to terms of a deferred payment agreement in a telephone conversation, the utility shall send the customer two fully completed copies of the agreement, signed by the utility, for the customer to sign and return.

(b) *Eligibility.*

(1) Any customer is eligible for a deferred payment agreement except the following:

(i) a customer who owes any amounts under a prior deferred payment agreement;

(ii) a customer who failed to make timely payments under a prior deferred payment agreement in effect during the previous 12 months;

(iii) a customer that is a publicly held company, or a subsidiary thereof;

(iv) a seasonal, short-term or temporary customer;

(v) an electric customer who, during the previous 12 months, had a combined average monthly billed demand for all its accounts with the utility in excess of 20 kw, or who registered any single demand on any account in excess of 40 kw;

(vi) a gas customer who during the previous 12 months had a combined total consumption for all of its accounts with the utility in excess of 4,000 therms;

(vii) a steam customer who during the previous 12 months had a combined total consumption for all its accounts with the utility in excess of 1,000 Mlbs;

(viii) a customer of any two or more services (gas, electric and steam) who is ineligible under subparagraph (v), (vi) or (vii) of this paragraph; or

(ix) a customer who the utility can demonstrate has the resources to pay the bill, provided that the utility notifies the customer of its reasons and of the customer's right to contest this determination through the commission's complaint procedures.

(2) The commission or its authorized designee may order a utility to offer a deferred payment agreement in accordance with this section to a customer whom it finds this section intended to protect, when an agreement is necessary for a fair and equitable resolution of an individual complaint.

(c) *Contents of offer.*

(1) Every offer of a deferred payment agreement shall inform the customer of the availability of a deferred payment agreement for eligible customers, set forth generally the minimum terms to which such customer is entitled, explain that more generous terms may be possible, and specify the telephone number and the times to call in order to discuss agreement.

(2) An offer pursuant to subparagraph (a)(1)(i) of this section shall also state the date by which the customer must contact the utility in order to avoid termination, and explain that the utility has the right to larger down payment if the deferred payment agreement is not entered into until after a field visit to physically terminate service has been made.

(d) *Terms of agreement.*

(1) A deferred payment agreement shall obligate the customer to make timely payments of all current charges.

(2) A deferred payment agreement offered pursuant to subparagraph (a)(1)(i) of this section may require the customer:

(i) to make a down payment of up to 30 percent of the arrears on which an outstanding termination notice is based, or the cost of twice the customer's average monthly usage, whichever is greater, plus the full amount of any charges bill after the issuance of the termination notice which are in arrears at the time the agreement is entered into; or

(ii) in the event a field visit to physically terminate service has been made, to make a down payment of up to 50 percent of the arrears on which an outstanding termination notice is based, or the cost of four times the customer's average monthly usage, whichever is greater, plus the full amount of any charges billed after the issuance of the termination notice which are in arrears at the time the agreement is entered into; and

(iii) to pay the balance in monthly installments of up to the cost of the customer's average monthly usage or one sixth of the balance, whichever is greater; and

(iv) to pay late payment charges during the period of the agreement; and

(v) to pay a security deposit in three installments, 50 percent down and two monthly payments of the balance, if previously requested in accordance with section 13.7 of this Part.

(3) A deferred payment agreement offered pursuant to subparagraph (a)(1)(ii) of this section, may require the customer to pay the outstanding charges in monthly installments of up to the cost of one half of the customer's average monthly usage, or one twenty-fourth of such charges, whichever is greater.

(4) a deferred payment agreement may provide for a greater or lesser down payment, a longer or shorter period of time, and payment on any schedule, if mutually agreed upon by the parties.

(e) *Form of agreement.* A deferred payment agreement form shall:

(1) set forth in general the terms of the agreement;

(2) indicate the due date for each installment, and the exact dollar amount of each installment, separately itemized to show the arrears payment and the security deposit payment, as applicable;

(3) indicate whether the agreement is subject to late payment charges, and if so, either set forth the exact dollar amount of the late payment charge to be paid with each installment or, if late payment charges are to be billed on the customer's regular cycle bill, a late payment charge disclosure statement. The disclosure statement shall include the late payment charge rate, on both a monthly and an annualized basis, how it is calculated, how and when the late payment charge will be billed, what the total cost of late payment charges on the agreement will be if the agreement if fully complied with, and a notice that the total late payment charges may be greater or less than the disclosed cost if the customer makes payments either early or late;

(4) state the date by which the copy signed by the customer, and any applicable down payment, must be received by the utility in order to become enforceable; provided, however, that such date may not be less than six business days after it is sent;

(5) inform the customer of the utility's policy if the agreement is not signed and returned as required;

(6) state that if the customer fails to comply with an agreement, the utility may send an immediate termination notice; and

(7) state that the customer may obtain the assistance of the commission to assure that the agreement is in conformance with this section.

(f) *Broken agreements.*

(1) The first time a customer fails to make timely payment in accordance with a deferred payment agreement, the utility shall give the customer a reasonable

opportunity to keep the agreement in force by paying any amounts due under the agreement.

(2) Except as provided in paragraph (1) of this subdivision, if a customer fails to comply with the terms of a deferred payment agreement, the utility may demand full payment of the total outstanding charges and send a final termination notice in accordance with section 13.3(b)(3)(ii) of this Part.

(g) Utilities shall comply with this section no later than March 18, 1988.